# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **2:08cr117-WHA** |
| | ) | |
| **RANDY BROOME** | ) | |
| | ) | |

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

On May 29, 2008, the Middle District of Alabama Grand Jury returned a three count indictment against defendant, Randy Broome ("Broome"). (Doc. #1). The indictment alleges Broome used his position as the site manager for the Federal Emergency Management Agency's ("FEMA") Housing Unit in Selma, Alabama to (1) willfully and knowingly embezzle and convert to his own use a 39 foot travel trailer, the same being property of the United States worth more than $1,000, and did receive, conceal, and retain the same with the intent to convert it to his use and gain; (2) willfully and knowingly embezzle and convert to his own use a government owned vehicle, the same being property of the United States worth more than $1,000, and did receive, conceal, and retain the same with the intent to convert it to his use and gain; and, (3) did corruptly endeavor to influence and impede a Special Agent with the Department of Homeland Security, Office of Inspector General, Office of Investigations, in the discharge of his duties in an official proceeding and investigation of Broome in the Middle District of Alabama. Broome argues the evidence against him was obtained in violation of the Fourth Amendment, and seeks suppression on those grounds. *See*

Docs. # # 17 and 23, *Motion to Suppress* and *Brief in Support of Motion*.  For the reasons below the Magistrate Judge recommends that the District Court DENY the motion to suppress.

## I. FACTUAL BACKGROUND

Washington Villavencencio ("Villavencencio") was employed by a FEMA subcontractor, TMI, Inc., from August, 2005 through April, 2006.  He became a FEMA employee in April, 2006.  In November, 2005, as FEMA continued its effort to house displaced victims of Hurricane Katrina, Villavencencio was sent to work at a staging area for FEMA trailers in Selma, Alabama.  While stationed in Selma, Villavencencio assisted in transporting trailers from the railyard to the staging site, photographing trailers, and inspections.  (Tr. 15-16.)  Ron Hall, Julio Diaz, and Randy Broome were Villavencencio's supervisors.  (Tr. 17.)  Around January or February of 2006, Villavencencio was with Broome, Hall, and Ron Pardon, supervisor of the refurbishing unit, when Broome told Hall to convert a Cherokee-model recreational vehicle (RV), bearing bar code #14510B, into a hunting lodge for use at his private property in Autauga County (the Autauga property).  (Tr. 20-21.)  Villavencencio said the trailer was a very cozy and plush "top of the line trailer," with ceiling fans.  (Tr. 21.)  Villavencencio had been to Broome's property in late 2005 to help a coworker take his all-terrain vehicle (ATV) to Broome's property, for later use in hunting.  (Tr. 21-22.)  Villavencencio stated that no trailer was on the property during his initial visit, but he knew the land was used for hunting because of the hunting stands and Broome's personal ATV was already on the site.

As Villavencencio's job duties entailed checking the progress of refurbishing in various units, he was able to monitor progress in the Cherokee.  The dinette area was dismantled and recliners were installed.  **Broome was overheard to comment on what a "great job" the workmen did as they refurbished the trailer.   (Tr. 24-25.)** Approximately one month after Broome told FEMA workers to convert the Cherokee into his hunting lodge, Villavencencio saw the trailer was no longer at the staging site.  (Tr. 26.) Around this time, Villavencencio heard Broome invite people to his hunting lodge over the FEMA two-way radios.  He said the "lodge" was not a secret at all, but public knowledge among FEMA employees.  (Tr. 20, 27.)  Villavencencio began to suspect Broome's "lodge" was the Cherokee missing from the FEMA staging site, and "took it upon himself" to verify that fact.  In his own words, Villavencencio said "I took my camera, I drove up to Autauga County, and I proceeded to enter the property."  (Tr. 27-28.)  The second trip to Broome's property was Mother's Day, 2006.  (Tr. 30-31; 37.)

Villavencencio parked his car on County Road 44, and proceeded down a gravel road to a cattle gate.  He found an unfastened lock on the gate, and was able to enter by pushing the gate open.  He trod along a path which had an open field on the left and weeds and brush on the right.  (Tr. 32-34; 42.)  After walking approximately 200 feet, Villavencencio came to a bend in the path where he could see a trailer.  (Tr. 34, 67.)  He knew the trailer was the Cherokee RV missing from the FEMA site, and took a picture of the bar code located on the front of the unit.  Villavencencio took additional pictures of the Cherokee, but did not enter the trailer.  (Tr. 35-36.)  He took the photographs from approximate distances of 15-20 feet.

(Tr. 61, 66.)  Villavencencio said he was not asked to find the RV as part of his job duties, but he felt he had an obligation to locate the unit.  (Tr. 37, 64.)  He later asked the FEMA allocation property officer if she could locate the Cherokee in the FEMA yard, but it did not appear in the FEMA inventory system.  (Tr. 47.)  During Villavencencio's last visit to Broome's property in November, 2006, the Cherokee was no longer on the site.  (Tr. 49-51.)  Villavencencio found another trailer, a Springdale, and Broome's government-issued truck.  He took photographs of the truck and trailer.  Villavencencio later met with some FEMA officials in Washington, D.C. to discuss what he believed to be program abuse.  After hearing his story, the officials asked if they could have his pictures.  (Tr. 54-55.)  The photographs prompted an investigation of Broome by FEMA.

Rich Tyus, a Selma resident, leases the Autauga property from a family in Detroit, Michigan.  Tyus grazes a herd of cattle on the land, and sublet a portion of the land to Broome to hunt on.  (Tr. 78-80; 83.)  Tyus gave Broome permission to put a trailer on the property, and would not have minded if Broome made his permanent residence on the property.  (Tr. 82.)  Tyus testified the cattle gate stays locked, and that he and Broome are the only people with keys.  (Tr. 86, 92.)  Tyus estimates the distance from the cattle gate to the point where the trailer was visible as 1000 to 1200 feet.  (Tr. 89, 90.)

Mary Ann Lyle served as FEMA's National Response Coordinator Manager when she became aware of Villavencencio's allegations and photographs concerning Broome's possible use of FEMA property.  (Tr. 95-96.)  She and two other FEMA officials from Atlanta, Georgia and the Gulf Coast Recovery Office traveled to Selma and Autauga County

to investigate.  The initial findings by this FEMA team resulted in a formal investigation of

Broome.  (Tr. 106-07.)

## II. DISCUSSION

The Fourth Amendment provides "[t]he right of the people to be secure in their

person, houses, papers, and effects, against unreasonable searches and seizures, shall not be

violated . . . ."  U.S. CONST. Amend. IV.  Broome's *Motion to Suppress* questions (1)

"whether and to what extent" Villavencencio's entry onto his property in May, 2006, "was

an act against which [he] is protected by the Fourth Amendment;" and, (2) whether the

subsequent statements by Broome and photographs of the Cherokee trailer were fruits of the

initial intrusion.   The United States responds that (1) the photographs taken by

Villavencencio did not constitute a Fourth Amendment search under the "open fields"

doctrine; (2) Broome does not have standing to suppress the photos; and (3) Villavencencio

did not act as a government agent for Fourth Amendment purposes.

Even though the facts demonstrate Broome holds a property interest in the land, the

protection of the Fourth Amendment does not immediately follow. *See Rakas v. Illinois*, 439

U.S. 128, 143, 99 S.Ct. 421, 430 (1978) ("capacity to claim the protection of the Fourth

Amendment depends not upon a property right in the invaded place but upon whether the

person who claims the protection of the Amendment has a legitimate expectation of privacy

in the invaded place," citing *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507 (1967)).

Consequently, the threshold issue in this case is whether Broome had a legitimate expectation

of privacy in the Autauga property.   Sometimes the issue is labeled as one of standing, but

it is "more properly placed within the purview of substantive Fourth Amendment law than within that of standing." *United States v. Chaves*, 169 F.3d 687, 690 (11th Cir. 1999) (citations omitted). The Eleventh Circuit recently explained how the Fourth Amendment only protects

> an individual in those places where [he] can demonstrate a reasonable expectation of privacy against government intrusion, and only individuals who actually enjoy the reasonable expectation of privacy have standing to challenge the validity of a government search.  The party alleging an unconstitutional search must establish both a subjective and an objective expectation of privacy.  The subjective component requires that a person exhibit an actual expectation of privacy, while the objective component requires that the privacy expectation be one that society is prepared to recognize as reasonable.

*United States v. King*, 509 F.3d 1338, 1341 (11th Cir. 2007) (internal citations omitted).  This framework is consistent with past statements by the Eleventh Circuit, which look to "whether a defendant can claim a 'reasonable expectation of privacy,'" as opposed to "whether an area or a place is constitutionally protected." *United States v. Berrong*, 712 F.2d 1370, 1373 (11th Cir. 1983), citing *Katz*, 389 U.S. at 360, 350, 88 S.Ct. at 516, 510.  While the precise expression of this test varies among decisions over the years, the fundamental requirements of a defendant's expectations and societal support for the same do not.

### A.  Subjective Expectation of Privacy

The United States argues the photographs taken by Villavencencio depicted areas not subject to the protection of the Fourth Amendment under the open fields doctrine.  The Eleventh Circuit has recognized "[T]here is no reasonable expectation of privacy for

activities conducted out of doors, in open fields, except in the areas shielded from view and immediately surrounding the home." *United States v. Taylor*, 458 F.3d 1201, 1208 (11th Cir. 2006), citing *Oliver v. United States*, 466 U.S. 170, 178, 104 S.Ct. 1735, 1741 (1984). *Berrong* applied the open fields doctrine to any area outside the "curtilage, or the immediate appurtenances, of a home." *Berrong, id.* at 1374.  The presence of fences or trespass signs do not prevent the application of the doctrine. *Oliver*, *id.* at 179, 104 S.Ct. at 1741; *Taylor*, 458 F.3d. at 1208.  Moreover, the open fields doctrine may apply to an area that is "neither 'open' nor a 'field' as those terms are used in common speech." *United States v. Nichols*, 248 Fed.Appx. 105, 106 (11th Cir. 2007), quoting *United States v. Dunn*, 480 U.S. 294, 304, 107 S.Ct. 1134, 1141 (1987).

Here, Villavencencio said he did not enter the Cherokee, and took the photographs from a distance of at least 15-20 feet.  Photographs entered into evidence as Government Exhibits 13-15 depict lawn chairs and an ATV under the trailer awning, with a cleared area of dirt with sparse grass immediately surrounding the trailer.  The photographs were taken from the area outside the cleared area where the presence of low brush and weeds suggest an area outside the curtilage of the Cherokee, as defined in *Berrong*.  Applying the open fields doctrine, Villavencencio remained outside the curtilage of the trailer and did not invade the "immediate appurtenances" of the trailer.  Therefore, the court agrees the photographs do not constitute an invasion of Broome's privacy

### B.  Objective Expectation of Privacy

Even if the court did not find Villavencencio took the incriminating photographs from

a position outside the curtilage of the trailer and therefore within the coverage of the open fields doctrine, the privacy test continues for Broome's objective expectation of privacy. *See Berong*, *id.* at 1373 (dismissing analysis of first prong to find no reasonable expectation under the second prong). This second prong requires a finding that society would recognize Broome's claim to privacy as reasonable. *King, id.*

Broome placed a 39-foot RV on the Autauga property for his personal use as a hunting lodge. The RV was United States property intended for use as temporary shelter for victims of a natural disaster. An appropriate comparison is found in a footnote to the *Rakas* decision, where the Court noted "a 'legitimate' expectation of privacy . . . means more than a subjective expectation of not being discovered. A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as 'legitimate.'" *Rakas, id.* at 143 n.12, 99 S.Ct. 430 n.12. The court finds this analogy applicable to Broome's attempt to suppress Villavencencio's photographs. Under *Rakas* example, Broome must show he had a legitimate expectation of privacy in property that was not his. He has not done so, and the court cannot identify any legitimate expectation of privacy which he, or society, may attach to the trailer. Absent such showing, the court answers the simple question of whether Broome's claim to privacy was "reasonable" or "legitimate" in the negative. *See United States v. Miravalles*, 280 F.3d 1328, 1333 (11th Cir. 2002) (finding defendant's expectation of privacy in common area of apartment building unreasonable and foolhardy).

In closing, the court finds Villavencencio's photographs violated neither (1) Broome's

subjective expectation of privacy under the open fields doctrine, nor (2) any objective expectation of privacy in the trailer that is recognized by society.   The Court finds Villavencencio's actions were not prohibited by the Fourth Amendment, and the photographs he took of the Cherokee RV are therefore admissible against Broome.

### III. CONCLUSION

For the foregoing reasons, it is the RECOMMENDATION of the Magistrate Judge that the motion to suppress filed by the defendant be DENIED.

***It is further ORDERED that the parties shall file any objections to the said Recommendation by September 16, 2008.***   Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.   *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982).  *See Stein v. Reynolds Securities, Inc*., 667 F.2d 33 (11th Cir. 1982).  *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed

down prior to the close of business on September 30, 1981.

Done this 3rd day of September, 2008.


/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE